1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                   **WESTERN DISTRICT OF WASHINGTON**

10    RYAN WALDRON,                              Civil No. 3:24-cv-05193-TMC

11            Plaintiff,                         **PLAINTIFF'S RULE 52 OPENING
                                                 TRIAL BRIEF**
12        vs.

13

14    UNUM LIFE INSURANCE COMPANY OF
      AMERICA,
15
              Defendant.
16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC

Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

<u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................. 1

II.   SUMMARY OF FACTS ...................................................................... 2

      A.    Waldron's Blossoming Career Comes to a Sudden Stop ........................ 2

      B.    Waldron's Medical Records Show His Disabling Symptoms ................. 3

      C.    Unable to Return to Work, Waldron Makes a Claim for LTD Benefits... 6

      D.    Unum denies Waldron's claim, painting his treatment intensity as "mild" .................................................................................... 8

      E.    With the assistance of counsel, Waldron appeals, providing objective evidence of cognitive impairment, unequivocal treatment provider support, declarations made under penalty of perjury, and an explanation why Unum's denial was illogical and counter to established law .......... 10

      F.    Unum upholds the decision based on a single paper file review ............ 12

III.  ARGUMENT ...................................................................................... 12

      A.    Waldron must establish disability by a preponderance of the evidence . 12

      B.    Waldron's self-reported symptoms, when combined with his treatment history, work history, treatment specialist's statements, and test results are more than sufficient to meet his burden of proof ............................ 13

      C.    The statements of Waldron and his mother are credible, first-person accounts of the disabling impact headaches, fatigue, and pain had on Waldron ...................................................................................... 15

      D.    Waldron's legal arguments offered in support of his appeal are persuasive ...................................................................................... 15

IV.   CONCLUSION................................................................................... 16

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC

1

Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

1

TABLE OF AUTHORITIES

2

Page(s)

Cases

3

4

*Armani v. Nw. Mut. Life Ins. Co.*,
840 F.3d 1159 (9th Cir. 2016) ........................................................................ 13

5

*Bledsoe v. Metro. Life Ins.*,
90 F. Supp. 3d 901 (C.D. Cal. 2015) .............................................................. 15

6

7

*Creel v. Wachovia Corp.*,
2009 WL 179584 n.20 (11th Cir. Jan. 27, 2009) ............................................ 14

8

*Cruz-Baca v. Edison International Long Term Disability Plan*,
708 Fed.appx. 313 (9th Cir. 2017) .................................................................. 14

9

10

*Demer v. IBM Corp. LTD Plan*,
835 F.3d 893 (9th Cir. 2016) ..................................................................... 14, 15

11

12

*Diaz v. Prudential Ins. Co. of Am.*,
499 F.3d 640 (7th Cir. 2007) ..................................................................... 14, 15

13

14

*Flaaen v. Principal Life Ins. Co.*,
226 F. Supp. 3d 1162 (W.D. Wash. 2016) ..................................................... 12

15

*Gallegos v. Prudential Ins. Co. of Am.*,
2017 WL 2418008 (N.D. Cal. June 5, 2017) .................................................. 15

16

17

*Garvey v. Piper Rudnick LLP Long-Term Disability Ins. Plan*,
2011 WL 1103834 (N.D. Ill. Mar. 25, 2011) ................................................. 12

18

19

*Hawkins v. First Union Corp. Long-Term Disability Plan*,
326 F.3d 914 (7th Cir. 2003) ...................................................................... 14, 15

20

*Jahn-Derian v. Metro. Life Ins. Co.*,
2016 WL 1355625 (C.D. Cal. Mar. 31, 2016) ........................................ 12, 14, 15

21

22

*Kibel v. Aetna Life Ins. Co.*,
2018 WL 832870 (9th Cir. Feb. 13, 2018) ..................................................... 15

23

24

*Leetzow v. Metro. Life Ins. Co.*,
2016 WL 7324092 (C.D. Cal. Dec. 5, 2016) .................................................. 15

25

*Letvinuck v. Aetna*,
439 Fed. Appx. 585 (9th Cir. 2011) ............................................................... 13

26

27

28

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC

2

Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

*Marcus v. Califano*,
615 F.2d 23 (2nd Cir. 1979) ...........................................................................................14

*Montour v. Hartford*,
588 F.3d 623 (9th Cir. 2009) ..........................................................................................13

*Muniz v. Amec Const. Management, Inc.*,
623 F.3d 1290 (9th Cir. 2010) ........................................................................................12

*Oliver v. Coca Cola Co.*,
497 F.3d 1181 (11th Cir.) ...............................................................................................14

*Palmer v. Standard Ins. Co.*,
994 F. Supp. 1221 (D.C. Oregon 1998) ..........................................................................14

*Perryman v. Provident Life & Acc. Ins. Co.*,
690 F. Supp. 2d 917 (D. Ariz. 2010) ..............................................................................14

*Salomaa v. Honda Long Term Disability Plan*,
642 F.3d 666 (9th Cir. 2011) ....................................................................................14, 15

*Sanchez v. Monumental Life Ins. Co.*,
102 F.3d 398 (9th Cir. 1996) ..........................................................................................13

*Silver v. Exec. Car Leasing Long-Term Disability Plan*,
466 F.3d 727 (9th Cir. 2006) ..........................................................................................12

*Yancy v. United of Omaha Life Ins. Co.*,
2015 WL 9311729 (C.D. Cal. Dec. 18, 2015)................................................................13

*Young v. Sun Life and Health Ins. Co.*,
285 F. Supp. 3d 1109, 1134-35 (E.D. Cal. 2018) ..........................................................15

Rules

*Civil Rule 7(e)(6)* ....................................................................................................................17

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC
3

Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

## I.    INTRODUCTION

This is an ERISA governed case regarding the denial of long term disability and waiver of premium for life insurance benefits. The *de novo* standard of review applies. Plaintiff, Ryan Waldron, was a program manager for James Hardie Building Products Inc. Through his employment, Waldron was covered by a LTD plan and Life Insurance Plan that was insured by Defendant, Unum. Sadly, two years out of college, Waldron became disabled by symptoms without a clear origin.

As the age-old insurance company mantra goes: diagnosis are not disabling, symptoms are disabling. Herein, the evidence shows that Ryan Waldron experienced disabling headaches, fatigue, and brain fog. While the headaches ultimately received a formal diagnosis and the brain fog was objectively verified by testing, the fact remains that extensive treatment and diagnostic tests were unable to identify why Waldron experienced these symptoms.

The day Waldron received his first COVID vaccine, he began experiencing disabling symptoms. Some of these symptoms resolved, but others did not. However, because he had not had COVID at that time, despite the significant overlap in his symptomology and those with long-COVID, he could not receive this diagnosis. Certainly, his treatment providers had theories as to why he would have long-COVID symptoms in response to the vaccine, but this did not rise to a diagnosis.

Yet the question before the Court is not whether diagnostic tests explain Waldron's symptoms. The question is whether Waldron suffered from symptoms that left him disabled under the terms of the LTD and LI Plans. On that question, the evidence is clear. As Unum's own Insurance Medical Examiner (IME) put it, "[t]he insured was undergoing rigorous evaluations, test and treatments due to unexplained symptoms." (3520).[1] The observation that evaluations and test results failed "to explain the insured's symptoms" is a red herring. (3520). That Waldron had symptoms is what matters.

---

[1] Citations in this format are to the bates numbering on the administrative record filed by Unum at Dkt. No. 14.

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC

1

Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

## II.  SUMMARY OF FACTS

### A.  Waldron's Blossoming Career Comes to a Sudden Stop

Waldron earned his bachelor's degree in mechanical engineering at California Polytechnic State University in 2019. He was very active in both high school and college, playing sports and participating in engineering and robotic clubs. (3013). After college, in July of 2019, Waldron started his career working for James Hardie as a production manager with a base salary around $104,000. (314). He managed the daily operation of a production line in a high speed, high volume, manufacturing environment. (3014). In a typical shift he managed 20 to 25 people, spending around 80% of the time moving about the plant reviewing production and employee performance. (3015).

By 2021, Waldron had a career he enjoyed, was moving up quickly within his company, and these successes enabled him to purchase a home in February 2021. Over the next several months, his family helped him put the house together so he could finally move in. But that never happened. Waldron received his first Covid vaccine on May 2, 2021, and immediately became ill.

At first, Waldron was sick with symptoms that appeared to be common vaccine side effects, but it was soon apparent that his illness was something more. (3017). After the flu-like symptoms subsided, Waldron continued having constant headaches, chronic fatigue, brain fog, dizziness, sleep issues, and double vision. For most of the next nine months he spent 22 hours out of the day in bed or on the couch. (3013, 3017).

After his symptoms developed, Waldron was no longer able to perform his work duties. His fatigue made it impossible to be on his feet for extended periods or climb up and down equipment. His chronic headaches made it impossible for him to concentrate or focus on specific tasks for the time needed to complete them. Waldron was unable to keep up with the pace of production, as his reaction times slowed due to the fatigue and distraction of the pain. Daily work activities such as computer use, reading, or talking with co-workers triggered flairs in his condition. (3015).

Despite these symptoms, Waldron tried to work. In August 2021, he was taking some medications that he thought were helping, so he went back into work to see how he could handle

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC
2
Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

it. Despite working in the office (he was not allowed to work out on the floor of the plant), he only made it 2-3 hours before his symptoms flared up and remained so severe he was not able to return the next day. About three weeks later, Waldron attempted to work again. Unfortunately, he only lasted for an hour before suffering a symptom flare. (3015).

About nine months after the symptoms started, Waldron started to feel a little better. His pursuit of effective treatment paid some dividends, allowing him to be more functional. (3018). But the improvement was relative. Waldron's symptoms stabilized to include chronic daily headaches, with an average pain level of 3 to 5 out of 10, but that can get to a 6 out of 10, insomnia, cognitive decline, vestibular vertigo, and chronic fatigue. (3013).

Except for headaches, which occur every day, Waldron has good days and bad days. The bad days happen about 7 to 10 days a month. On these days, Waldron becomes fatigued, may develop double vision or have difficulty focusing, and experiences vertigo. (3013). Sometimes a flare will be so bad that a migraine will develop. When this happens, Waldron's pain rises to an 8 out of 10, feeling like a lightning bolt through his forehead. (3014).

On a good day, Waldron is able to go to the gym, use the sauna, and perform limited exercise (i.e. 10 minutes of easy cardio). However, even on a good day, he will have a headache at 3-5 out of 10 and fatigues easily. Because of this, he must rest frequently. (3014). Everything he does takes longer for him to accomplish. He moves more slowly and takes excessive breaks. What had been 30-minute tasks now take Waldron hours. (3016).

**B.    Waldron's Medical Records Show His Disabling Symptoms**

On May 8, 2021, Waldron's Family Practice provider first reported abnormal symptoms. (1911). Waldron treated again on May 11, 2021, to discuss post Covid vaccination symptoms. He complained of mental fog, weakness, shortness of breath, fatigue, and intermittent low-grade fever. (3046). A referral was made to neurology and infectious disease. (3051).

The neurological consultation took place on May 27, 2021. A review of Waldron's systems was significant for fatigue, headaches, generalized weakness, and eye pain. (328). The neurologist's impression was these symptoms were caused by the Covid vaccine. However, an MRI of Waldron's head was ordered to investigate further. (327). The MRI was normal. (325).

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC

3

Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

1    In a follow-up visit with the neurologist on June 9, 2021, it was documented that Waldron

2    continued to experience fogginess and pressure in his head. He found it difficult to drive.

3    However, the neurologist had no additional treatments at that point in time. All he could do was

4    "reassure[] him that he should continue to improve…." (320).

5    Due to ongoing brain fog, fatigue, shortness of breath, dizziness and headaches, on June

6    11, 2021, Waldron's treatment provider wanted to explore possible heart issues. (3108). That day,

7    he underwent a chest X-ray. The findings were normal. (3216).

8    Waldron treated his ongoing eye problems on June 15, 2021. He complained of a loss of

9    focus and pressure behind his eyes that goes up his head. Following examination, Waldron was

10    assessed to have bilateral visual discomfort. (3217). With ongoing reports of headache, fatigue,

11    head pressure, double vision, inability to concentrate for any length of time, and dizziness, at the

12    end of June, Waldron's treatment providers completed a Pfizer vaccine questionnaire regarding his

13    experience. (3278-84).

14    On July 1, 2021, Waldron saw an infectious disease specialist. The treatment notes

15    recorded persistent headache, fatigue, loss of concentration/coordination, and double vision after

16    the vaccination. Based on Waldron's history, the specialist was able to rule out prior events as the

17    cause of the protracted headache, fatigue, and loss of concentration/coordination. (3094). That

18    same day, Waldron requested a remote consultation with the Mayo Clinic because "I have medical

19    symptoms without a clear diagnosis." (3405).

20    The real-time video consultation with the Mayo Clinic in Rochester took place on July 2,

21    2021. Current symptoms included headache (daily), fatigue, brain fog, and dizziness and blurred

22    vision occurring intermittently. (3083). The Mayo Clinic felt Waldron's constellation of symptoms

23    overlapped significantly with post-acute COVID syndrome (PACS), even though he had not been

24    infected. Thus, it was postulated that the inappropriate immune response that underlies PACS may

25    have occurred in reaction to the vaccine, with symptoms mimicking PACS. With signs of gradual

26    improvement, it was recommended that he avoid overexertion and continue to gradually and

27    carefully increase mental and physical activity. (3084).

28

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC

4

Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

1   Waldron saw a specialist in rehabilitation medicine on July 13, 2021. Current symptoms
2   included headache, fatigue, brain fog, and vision problems. Waldron "felt down due to lack of
3   available treatment. Frustrated with lack of available treatment." (3076). A series of
4   recommendations were provided, including nutrition recommendations, potential medications, and
5   a formal physical therapy program. (3078).

6   Following these recommendations, Waldron started a very strict nutrition plan. (3014). He
7   also started taking the recommended medications. After two weeks on the medications, he noticed
8   improvement. The most notable change was a decrease in the severity of symptoms when Waldron
9   first woke up. Before the medication, it could take up to four hours to see improvement in his
10   headache and grogginess. "It now takes about an hour on ~50% of the days. Put simply, it has
11   expanded the window where I feel good during the day." (1278).

12   On July 28, 2021, Waldron started physical therapy, which continued for about a year. At
13   that time he was unable to work, exercise, or drive for other than very short periods. His
14   symptoms fluctuated such that he had good days and bad says without explanation. However, in
15   general, increased activity or time on the computer increased his headaches and dizziness.
16   Waldron's goal with PT was to return to work, exercise, and life. (607).

17   A cardiologist evaluated Waldron on August 5, 2021. The cardiologist documented
18   significant improvement, but Waldron was still very limited in his ability to perform physical
19   activities. However, as discussed above, Waldron was going to attempted a return to work. (1346).

20   Physical therapy notes from August 9, 2021 gave insight into Waldron's improvement. He
21   had increased his walking to 15-minutes twice a day, "which is very fatiguing but doing much
22   better." (602). Mild exercise caused a headache and dizziness. "Reading is better—but can now
23   still only read about ½ page on screen or paper before vision goes blurry and can't focus on it any
24   longer." (602).

25   Waldron worked for the first time since the vaccine on August 17, 2021. He lasted four
26   hours and "felt tired by the end of the day" with increased head pressure and dizziness. (598).
27   Treatment notes from August 23, 2021, confirmed Waldron's inability to continue work: "have
28   had a rough time since I went into work last week; have essentially crashed." (595). The PT

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC
5
Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

provider wrote that Waldron "appears very fatigued today." (595). Progress was slow. PT the following week set a goal of walking for 20-minutes without extreme exhaustion or increased symptoms. (591).

Medical treatment on September 9, 2021, reported that Waldron had felt like he was doing better and had returned to work. However, afterwards, his "symptoms got way worse again." (3723). Waldron's symptoms were "persistent and debilitating." (3723). He had barely spoken a word over the prior three weeks, mainly sitting on the couch. His headache would not go away and he was fatigued throughout the day. (3723).

However, Waldron continued to work to get better. PT notes from September 24, 2021, showed an improvement in his symptoms. Even though he got fatigued with exercise, Waldron felt positive about his progress. (574). Sadly, the cycle continued. During PT the next week, Waldron reported that he overdid it a little during the last PT session and experienced a mild increase in his fatigue and head pressure. (569).

Another video consultation with the Mayo Clinic took place on September 30, 2021. Since the last visit, Waldron had enrolled in care with the University of Washington's post-COVID rehab program. The medication changes in August had made him feel "normal for a 2 week window, and during that time resumed working, went out on his boat, and went golfing." (279). However, all this activity resulted in a symptom rebound and a two-week flare. Waldron explained that his daily routine was sleeping, then spending the rest of the day on the couch, except for going to PT or doing some mild exercise. (279). Unfortunately, as documented in his PT notes the following week, the Mayo Clinic doctor did not have any other ideas for treatment. (567).

**C.    Unable to Return to Work, Waldron Makes a Claim for LTD Benefits**

With treatment continuing through October without material improvement, Waldron started the process of applying for disability benefits. Initially, he asked his provider at UW to complete the paperwork. However, he felt he was unable to do so because there was no confirmed COVID diagnosis, and thus no post-COVID syndrome diagnosis. He recommended Waldron ask his primary care provider to complete the form. (1189).

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC
6
Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

1    Before that happened, a PT Progress Assessment took place. The November 15, 2021,

2    assessment showed that Waldron was disabled due to head pressure and fatigue. (3246). He was

3    having decent days about 50% of the time. On a decent day, Waldron tried to be as active as he

4    could, including trying to perform about 30 minutes a day of cognitive activity on the computer.

5    He had demonstrated slow improvement but had not met his goal of returning to work. (3247).

6    On December 1, 2021, Waldron's PCP office completed Unum's disability certification

7    forms. On the form, Paul Surette, a physician's assistant, explained that Waldron suffered from

8    severe fatigue, ongoing headache, vision disturbance, and sleep disruption. Despite extensive

9    workup, it was estimated that Waldron would be disabled until May of 2022, but that depended on

10   progress. (94-95).

11   In a letter dated December 6, 2021, Unum explained that Waldron was approaching the

12   point where short term disability benefits end and his claim would be considered for benefits

13   under the LTD Plan. Unum stated, "Although you have been approved for Short Term Disability

14   benefits, you are not automatically eligible or approved for Long Term Disability benefits." (60).

15   As documented in treatment from December 7, 2021, Waldron seemed to be having

16   improvement in his symptoms, "however still significant disability from postviral or postvaccine

17   syndrome." (752).

18   Unum spoke with Waldron about his disability on December 14, 2021. Unum asked what

19   Waldron thought happened. Waldron explained that he was open to the possibility of it being

20   something other than the vaccine, in fact he would prefer if it was as that would be treatable, but

21   he didn't see what else it could be. Waldron also discussed how he had made attempts to return to

22   work, but would pay for it afterwards with a flare in symptoms. (228).

23   On December 20, 2021, Waldron underwent testing with a laboratory that claimed to be

24   able to detect some biological markers of long-COVID. He tested positive. (3209).

25   Treatment with UW's neurology headache clinic documented uncontrolled headache. The

26   January 6, 2022, notes explained that Waldron had a headache every day, but 10 severe headaches

27   per month. The average pain severity was 5/10 at baseline, but it would increase to 6 or 7/10 with

28   activity. (1150). Headaches were exacerbated by physical exertion, mental exertion, being at work,

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC
7
Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

1   eye strain, and computer work. (1151). The neurologist diagnosed Waldron with new daily

2   persistent headache (NDPH) because he met "International Headache Society Criteria for NDPH

3   in the contest of COVID vaccine." (1154). With the diagnosis and a treatment plan, Waldron

4   looked forward to implementing the plan "so that he can feel better and start healing." (1156).

5          Part of the plan started on January 11, 2022. That day, Waldron participated in a shared

6   medical visit with UW Headache Clinic during which there was a group discussion about

7   treatment modalities. (1131). Two days later, PA Surette treated Waldron. The cycle of

8   improvement and flare was discussed, as was the fact he "is still plagued by fatigue and

9   dizziness…." (3037).

10         Unum called Waldron on January 19, 2022. Unum explained that it had not received some

11  office visit notes, but per its guidelines, it was supposed to have a decision on his claim by the

12  next day. Unum asked Waldron if he was agreeable to an extension while Unum gathered

13  additional information. Waldron agreed to the extension. (495). Unum confirmed the extension in

14  writing. (497).

15         Effective January 27, 2022, a new PT Plan of Care was put in place for Waldron. The

16  clinical impression was that Waldron had demonstrated slow improvement in his ability to tolerate

17  more physical activity. However, his symptoms varied greatly, partly due to changes in activity.

18  Waldron continued to deal with vision problems as he fatigued, head pressure, sleep problems, and

19  difficulty maintaining concentration. (1082). He had not met the goal of being able to function

20  fully at work without difficulty or exhaustion. (1083).

21         This unpredictability of symptoms continued to be documented in treatment records. On

22  February 2, 2022, Waldron reported he was doing "somewhat better today," but it was "[v]ery

23  difficult to know how he will feel one day to the next." (2335).

24         **D.    Unum denies Waldron's claim, painting his treatment intensity as "mild"**

25         To determine if Waldron was disabled, on February 8, 2022, Unum had Dr. Maribelle R.

26  Kim, internal medicine, review his medical records. Dr. Kim noted Waldron had undergone an

27  "extensive diagnostic workup," but felt the "[r]ecords overall indicate that his reported symptoms

28  are inconsistent with and out of proportion to his extensive diagnostics, exam findings by multiple

---

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC

Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

1    providers, as well as the initial insult….” (697). When Dr. Kim analyzed all of Waldron's

2    conditions, she claimed that he was not disabled from October 25, 2021, forward. Dr. Kim did not

3    explain what supported Waldron's disability prior to October 25, 2021, or how his condition and

4    medical documentation differed thereafter, offering only that this was the date of a normal

5    echocardiogram. (698). Dr. Kim never saw Waldron and did not recommend that Unum have him

6    examined—as is Unum's right under the LTD Plan.

7         Because Dr. Kim viewed the assessment of Waldron's disability as an issue of

8    interpretation of the data, not one of adequate information, what she asked for was that Unum have

9    another doctor review the file and offer an opinion. (698). Before that review took place, Waldron

10   treated with PA Surette. During the February 15, 2022 visit, Waldron reported that he had actually

11   had COVID two weeks prior. Remarkably, Waldron reported that after having COVID, he

12   “actually had significant improvement in his chronic fatigue.” (3099). Even though Waldron was

13   feeling much better at that moment, he continued to have low stamina and felt like his muscles

14   tired out very quickly. (3099).

15        On February 17, 2022, Unum called Waldron and asked for more time to decide his claim.

16   He agreed to Unum's request. (685). On February 20, 2022, PA Surette responded to a letter from

17   Unum indicating his agreement that the diagnostic testing did not support Waldron's disability

18   from October 25, 2021 forward. (689). Of course, this should come as no surprise, as Waldron's

19   diagnosis and disabling symptoms are not apt to measurement by diagnostic testing and thus did

20   not support his disability before or after that date. The relevant question is whether Waldron

21   suffered from fatigue, headaches, and brain fog.

22        Waldron, of course, continued to treat these symptoms to get better. His PT records from

23   February 23, 2022, recorded that he felt 20% improved since having COVID. Despite being

24   “pleased” by his improvement, he continued to be limited by fatigue and headaches. (2297).

25        The next day, Dr. Zachary Gross, internal medicine, offered his opinion about Waldron

26   after reviewing some of the medical records. He agreed with Dr. Kim's assessment that Waldron

27   was not disabled from October 25, 2021, forward. Yet Dr. Gross differed from Dr. Kim on some

28

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC

9

Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

1   things, including his interpretation that Waldron's treatment intensity "has been of mild
2   intensity…." (704).

3         According to Dr. Gross, the "most pertinent evidence" supporting his opinion was the
4   normal ECHO on October 25, 2021, and Waldron's "1/6/22 Dr. Murinova, Neurology: Exam
5   normal." (704). Dr. Gross did not explain why an ECHO, which looks at the heart, was one of the
6   two most pertinent pieces of evidence regarding Waldron's symptoms.

7         Equally strange, the other most pertinent piece of evidence supporting Dr. Gross's opinion
8   was a neurological headache clinic treatment record that documented "uncontrolled headache,"
9   (1149) "10 days of severe headache per month," (1150) headaches triggered by physical and
10  mental exertion, (1151) "In the past 3 months, headaches have interfered with Ryan's normal work
11  (outside and home): Extremely," (1152) and "Ryan has headaches that meet International
12  Headache Society Criteria for NDPH in the context of COVID vaccine. Patient feels not only
13  severe disabling pain, but also unable to function due to headaches." (1154).

14        In a letter dated February 28, 2022, Unum denied Waldron's claim for LTD benefits.
15  Therein, Unum adopted the opinions of Drs. Gross and Kim. (717-23).

16   **E.    With the assistance of counsel, Waldron appeals, providing objective evidence**
17   **of cognitive impairment, unequivocal treatment provider support,**
18   **declarations made under penalty of perjury, and an explanation why Unum's**
19   **denial was illogical and counter to established law**

20        On August 22, 2022, Waldron appealed Unum's denial of his LTD claim. In his cover
21  letter, Waldron stated that he had every intention of continuing at his current job once he was
22  better, that his recovery was taking longer than he had anticipated, but he was improving. He was
23  open to seeing any doctor or performing any test that Unum recommended to substantiate his
24  disability claim. He simply asked Unum to "let me know" what those were, as "I want my life
25  back." (846).

26        Waldron also included the findings from a Quantitative EEG that indicated "some slowing
27  in the brain, but also some fast wave activity in other areas which could be contributing to
28  memory problems and reported problems with cognition." (981). Dr. David Palacios also

---

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC

Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

confirmed Waldron was disabled and unable to work in a certification dated August 10, 2022. (941).

Days later, Waldron withdrew his appeal (1018) and hired counsel to assist with his appeal submission. (1024). With the assistance of counsel, on February 27, 2023, Waldron submitted his appeal. The appeal included a 30-page letter explaining why Unum's denial was incorrect (2983-3012), several thousand pages of medical evidence, a Neuropsychological Evaluation (3020-28), letters from three treatment providers supporting Waldron's continued inability to return to work (3029, 3030, 3031), and sworn declarations from Waldron (3013) and his mother (3017).

In a letter dated January 10, 2023, Dr. Steven Plaza confirmed that Waldron suffered from fatigue, brain fog, and head pain and pressure. In his medical opinion, these symptoms left Waldron "unable to perform the material duties of his own occupation full time with reasonable continuity." (3030).

On January 14, 2023, Dr. Palacios noted Waldron suffered from headaches and significant fatigue. Based on his medical experience, the severity and duration of Waldron's symptoms were reasonable given his condition. They were also "disabling." (3029).

Scott Marsland, nurse practitioner at the Advanced COVID Care Center, offered his assessment on January 19, 2023. In his experience, a patient in Waldron's condition faced a long and slow path to recovery, extending easily beyond a year, with an uncertain degree of functionality at that time. "The very idea that [Waldron] would be able to work an eight hour shift which demanded standing and physical exertion, let alone mental focus and multi-tasking, in his current state is neither realistic nor likely in the near future." (3033).

Of course, the Neuropsychological Evaluation results also supported Waldron's claim. Notably, the objective testing showed there was "no evidence of severe psychiatric illness, conversion disorder, or malingering." (3026). The testing was also valid, even though fatigue and chronic pain were reported and observed during the evaluation, and may have affected test performance. (3025). The testing showed Waldron had weakness in processing speed and verbal fluency. (3026). His fatigue and experience of daily pain made it difficult for him to maintain

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC

11

Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

cognitive and functional tasks. He was more prone to forgetfulness, delayed responsiveness, inattention, and making errors. (3027).

**F.    Unum upholds the decision based on a single paper file review**

In response to the appeal, Unum obtained a file review from Dr. Steven Winkel, internal medicine. It was Dr. Winkel's opinion that as of October 25, 2021, the evaluations and test results noted no significant physical, diagnostic, or imaging findings to explain the insured's symptoms. However, Dr. Winkel acknowledged that "The insured was undergoing rigorous evaluations, tests, and treatments due to unexplained symptoms." (3567).

Dr. Winkel's findings were provided to Waldron's counsel. They responded on May 4, 2023 and explained why Unum's evaluation of the claim was erroneous. (3577-91). Despite this, without evidence refuting that Waldron was experiencing symptoms that were disabling, Unum upheld the denial of LTD and LI benefits in a letter dated May 12, 2023. (3595-3609).

**III.    ARGUMENT**

**A.    Waldron must establish disability by a preponderance of the evidence**

The *de novo* standard of review applies because there is no grant of discretion in the Plans and both Illinois and Washington have banned discretionary clauses.[2] In a *de novo* review, the default standard under ERISA, the Court undertakes an independent and thorough inspection of the administrator's decision without affording any deference at all to the plan administrator's findings.[3] As a result, the Court should evaluate whether Waldron was disabled within the terms of the Plan, and after evaluating the persuasiveness of conflicting evidence, decide which was more likely to be true. It is Waldron's burden to show an entitlement to benefits under the Plan.[4]

---

[2] *Garvey v. Piper Rudnick LLP Long-Term Disability Ins. Plan*, 2011 WL 1103834, at *2 (N.D. Ill. Mar. 25, 2011); *Flaaen v. Principal Life Ins. Co.*, 226 F. Supp. 3d 1162, 1166 (W.D. Wash. 2016).

[3] *Silver v. Exec. Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 728 (9th Cir. 2006).

[4] *Muniz v. Amec Const. Management, Inc.*, 623 F.3d 1290, 1296 (9th Cir. 2010); *Jahn-Derian v. Metro. Life Ins. Co.*, 2016 WL 1355625 at *5-6 (C.D. Cal. Mar. 31, 2016).

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC

12

Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

1    To prevail in doing so, he needs to prove it was "more likely than not" that he was disabled under

2    the terms of the Plan.[5]

3        **B.**    **Waldron's self-reported symptoms, when combined with his treatment**

4               **history, work history, treatment specialist's statements, and test results are**

5               **more than sufficient to meet his burden of proof**

6          Unum's primary complaint is that Waldron and his treatment providers have not provided

7    objective evidence in the form of diagnostic findings or imaging findings to support his

8    symptoms. *See* (697, 3520). In its letters and conversations, Unum was careful never to

9    specifically use the words "objective evidence," but its claim notes and correspondence clearly

10   demonstrated that this was the only type of evidence it would find acceptable in Waldron's case.[6]

11   Of course, finding this information lacking, Unum did not exercise its right to have Waldron

12   undergo a medical examination or testing, belying its claim that diagnostic results or imaging

13   results was necessary.[7]

14         However, crucially, Waldron is not required to provide "objective evidence" of his

15   disability. The Policy does not require it, nor is there anything in ERISA that requires it.

16   Likewise, the definition of disability does not include any objective evidence requirement.

17   (3605-06).[8]

18         Furthermore, many disabling symptoms are either not measurable or difficult to measure

19   _____

20   [5] *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2016); *Sanchez v. Monumental
     Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996) (defining "preponderance of the evidence" as

21   "more likely than not").

22   [6] This is likely because Unum has been accused by government regulators of accepting only
     objective test results to support disability even where no policy provision required them, and

23   forced to stop that practice. *See, e.g.*,
     https://www.sec.gov/Archives/edgar/data/5513/000119312505195355/dex101.htm (settlement

24   agreement between Unum and California Department of Insurance).

25   [7] *Montour v. Hartford*, 588 F.3d 623, 634 (9th Cir. 2009) (conducting "pure paper" review may
     raise questions about the thoroughness and accuracy of the benefits determination); *Letvinuck v.*

26   *Aetna*, 439 Fed. Appx. 585, 587 (9th Cir. 2011).

27   [8] *See Yancy v. United of Omaha Life Ins. Co.*, 2015 WL 9311729 at *19 (C.D. Cal. Dec. 18,
     2015) ("The Court agrees with Plaintiff that Defendant effectively construed the Plan as

28   requiring objective, as opposed to subjective, evidence in order to approve Plaintiff's claim").

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC
13
Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

by objective diagnostic methods. As the Ninth Circuit has recognized, "Many medical conditions depend for their diagnosis on patient reports of pain or other symptoms, and some cannot be objectively established."[9] In short, a claim administrator cannot "condition[] an award on the existence of evidence that cannot exist[.]"[10] Regarding Waldron's symptoms, he explained this to Unum. (2989). Courts agree, holding that administrators cannot expect claimants to provide objective evidence of headaches or fatigue because no such tests exist.[11] As a result, Waldron was not required to present Unum with objective evidence supporting the existence of his symptoms.

In fact, it is proper to base a disability determination on a patient's self-reported symptoms if they are credible.[12] "Objective" or "measurable" evidence of disability is not required. Credible evidence of a claimant's symptoms, based on his own reports and the medical reports of examining physicians is more than sufficient to establish disability.[13] The severity of symptoms,

[9] *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 678 (9th Cir. 2011); *see also Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1196 (11th Cir.), *reh'g granted, opinion vacated in part*, 506 F.3d 1316 (11th Cir. 2007), *and adhered to in part on reh'g*, 546 F.3d 1353 (11th Cir. 2008) ("Indeed, the only evidence of a qualifying disability may sometimes be the sort of evidence that [defendants] characterize as 'subjective,' such as physical examinations and medical reports by physicians, as well as the patient's own reports of his symptoms."); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003) ("pain often…cannot be detected by laboratory tests"); *Perryman v. Provident Life & Acc. Ins. Co.*, 690 F. Supp. 2d 917, 945-946 (D. Ariz. 2010) (cannot discount opinions of treating physicians because they relied on subjective complaints); *Jahn-Derian v. Metropolitan Life Ins. Co.*, 2016 WL 1355625 at *9 (C.D. Cal. Mar. 31, 2016) ("subjective complaints can form the basis of a disability claim, even when no objective medical evidence is available to verify or measure the pain").

[10] *Salomaa*, 642 F.3d at 678.

[11] *See, e.g., Creel v. Wachovia Corp.*, 2009 WL 179584 at *8 n.20 (11th Cir. Jan. 27, 2009) ("Neither party has identified any objective tests that would automatically establish the existence of neurologically-based migraines, and there appears to be no set standard for establishing the existence of migraines.").

[12] *See e.g. Demer v. IBM Corp. LTD Plan,* 835 F.3d 893, 905-06 (9th Cir. 2016); *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 645-6 (7th Cir. 2007); *Hawkins v. First Union Corp.*, 326 F.3d 914, 919 (7th Cir. 2003); *Marcus v. Califano*, 615 F.2d 23, 27 (2nd Cir. 1979); *Palmer v. Standard Ins. Co.*, 994 F. Supp. 1221, 1233-4 (D.C. Oregon 1998); *Cruz-Baca v. Edison International Long Term Disability Plan*, 708 Fed.appx. 313, 315 (9th Cir. 2017).

[13] *Demer*, 835 F.3d at 905-06; *Marcus*, 615 F.2d at 27; s*ee also*, *Palmer*, 994 F. Supp. at 1233-1234.

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC

14

Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

1   so long as they are consistent with and supported by the other evidence, will, of necessity, be

2   established by self-reported symptoms and physical complaints.[14] It is sufficient that the

3   preponderance of the evidence suggests that Waldron's subjective complaints derive from his

4   medical conditions and the symptoms associated with those conditions.[15]

5       Herein, there can be no meaningful dispute that the pain, fatigue, and brain fog Waldron

6   reported was legitimate. When Waldron began to experience these symptoms, he sought extensive

7   treatment to find a cure. There is no evidence he was not fabricating or exaggerating his

8   symptoms to facilitate a disability claim. Like with all claims based on subjective symptoms, the

9   lack of objective evidence alone was not a valid basis for denying Waldron's benefits.[16]

10      **C.    The statements of Waldron and his mother are credible, first-person accounts**

11          **of the disabling impact headaches, fatigue, and pain had on Waldron**

12      The Ninth Circuit has emphasized the importance of personal statements when evaluating

13  the credibility of subjective symptoms.[17] The sworn declarations offered by Waldron and his

14  mother are consistent with contemporaneous medical evidence. They provide personal,

15  unequivocal, and credible support for the severity of Waldron's symptoms. While this is evidence

16  Unum did not consider when performing its evaluation, Waldron asks the Court to consider all the

17  evidence and to find it satisfies his burden to establish disability under the Plan.

18      **D.    Waldron's legal arguments offered in support of his appeal are persuasive**

19      During the appeal process, Waldron's counsel explained the problems with Unum's

20  decision and offered extensive citations to legal precedent supporting his position. However,

21

22  [14] *E.g. Hawkins*, 326 F.3d at 919; *Diaz*, 499 F.3d at 645-6; *Bledsoe v. Metro. Life Ins.*, 90 F.
    Supp. 3d 901, 913 (C.D. Cal. 2015); *Gallegos v. Prudential Ins. Co. of Am.*, 2017 WL 2418008
23  at *9-11 (N.D. Cal. June 5, 2017); *Leetzow v. Metro. Life Ins. Co.*, 2016 WL 7324092 at *9
    (C.D. Cal. Dec. 5, 2016); *Jahn-Derian v. Metro. Life Ins. Co.*, 2016 WL 1355625 at *7 (C.D.
24  Cal. Mar. 31, 2016).

25  [15] *Bledsoe*, 90 F. Supp. 3d at 913; *Gallegos*, 2017 WL 2418008 at *9-11.

26  [16] *Young v. Sun Life and Health Ins. Co.*, 285 F. Supp. 3d 1109, 1134-35 (E.D. Cal. 2018); *Jahn-Derian*, 2016 WL 1355625 at *7; citing *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d
    666, 678 (9th Cir. 2011).

27  [17] *Demer*, 835 F.3d at 905; *Kibel v. Aetna Life Ins. Co.*, 2018 WL 832870 at *2 (9th Cir. Feb. 13,
28  2018).

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC

Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

1  Unum never responded to these criticisms. Thus, Waldron again presents these arguments by

2  reference and challenges Unum to explain why they are incorrect. The incorporated arguments

3  are:

4      Mr. Waldron's condition is well-documented. (2989).

5      Unum must take Mr. Waldron's self-reported symptoms at face value. (2989).

6      Unum must give substantial weight to Mr. Waldron's treating physicians' opinions.

7      (2990).

8      Mr. Waldron's Neuropsychological Evaluation is Objective Evidence Finding Functional

9      Impairment. (2994).

10     Unum failed to consider Mr. Waldron's ability to work with reasonable continuity. (2997).

11     Unum relied on flawed file reviews. (2999).

12     Unum failed to give full weight to records from October 25, 2021, onwards. (3577).

13     Unum engaged in red herring analysis. (3581).

14     The misrepresentation of the significance of "no acute distress" (3584).

15  **IV.    CONCLUSION**

16     Waldron asks the Court to find he met his burden of proof regarding disability and

17  reinstate his benefits under both the LTD and LI Plans.

18     Dated this 6th day of November, 2024[18]

19                                    MONAHAN TUCKER LAW

20

21                                    BY: *s/Stacy Monahan Tucker*
                                       Stacy Monahan Tucker
22                                     WSBA 43449
                                       Monahan Tucker Law
23                                     14241 Woodinville-Duvall Road, Suite 382
                                       Woodinville, WA 98072
24                                     E-mail: smtucker@mtlawpc.com
                                       Telephone: (206) 486-3553
25                                     Facsimile: (206) 800-7801

26

27  ────────────────
    [18] Mr. Brehm apologizes to the Court and Defendant for filing this brief a few hours late. He
    elected to allow his assistant to clock out and he would do the final formatting of the brief and
28  filing himself. That process took longer than he expected.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KANTOR & KANTOR, LLP

By: */s/ Brent Dorian Brehm*
Brent Dorian Brehm
(Admitted pro hac vice)
KANTOR & KANTOR LLP
9301 Corbin Ave. Suite 1400
Northridge, CA 91324
E-mail: bbrehm@kantorlaw.net
Telephone: (818) 886-2525
Facsimile: (818) 350-6272

Attorneys for Plaintiff,
RYAN WALDRON

### *Local Civil Rule 7(e)(6) Certification*

I certify that this memorandum contains no more than 5925 words, including footnotes, in compliance with Local Civil Rules.

*/s/ Brent Dorian Brehm*

Brent Dorian Brehm

PLAINTIFF'S RULE 52 OPENING TRIAL BRIEF
Case No.: 3:24-cv-05193-TMC

17

Kantor & Kantor, LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525