UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RYAN WALDRON,<br><br>                    Plaintiff,<br><br>        v.<br><br>UNUM LIFE INSURANCE COMPANY OF<br><br>AMERICA,<br><br>                    Defendant. | Case No. 3:24-cv-05193-TMC<br><br>ORDER GRANTING PLAINTIFF'S RULE 52 MOTION FOR JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION |

## I.    INTRODUCTION

This dispute arises out of Plaintiff Ryan Waldron's claim for long term disability (LTD) benefits from Defendant Unum Life Insurance Company of America. Unum administered a disability benefits plan through Waldron's employer. When Waldron began suffering chronic and debilitating fatigue following his first dose of the COVID-19 vaccine, he could no longer work. Waldron was ultimately forced to make a claim for LTD benefits. Unum denied the claim, asserting that Waldron had failed to offer the necessary medical evidence to support his claim.

Waldron appealed the denial, and after his appeal was denied, he filed suit against Unum. Dkt. 1. Waldron then moved for judgment on the record under Federal Rule of Civil Procedure 52. Dkt. 15. Waldron argued that Unum had improperly denied his claim and he was owed LTD

benefits. Unum cross-moved for judgment, claiming that the company did not owe Waldron any benefits. Dkt. 16.

Waldron bears the burden of showing by a preponderance that he was disabled within the meaning of the plan and was therefore entitled to LTD benefits. The Court finds that Waldron has met this burden. Thus, the Court GRANTS Waldron's motion (Dkt. 15) and DENIES Unum's cross-motion (Dkt. 16). The Court holds that Waldron was disabled within the meaning of the Plan with respect to his "regular occupation" and is entitled to receive LTD benefits.[1] The parties shall meet and confer regarding the amount of benefits owed and any prejudgment interest, and jointly submit a proposed judgment within ten (10) days of the date of this Order. Plaintiff's request for attorney's fees under 29 U.S.C. § 1132(g) must be filed no later than 14 days after the entry of judgment as required by Federal Rule of Civil Procedure 54(b)(2). The fee petition shall be noted as a 21-day motion under this Court's local civil rules.

## II.   PROCEDURAL ISSUES

The Plan at issue here is governed by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, et seq. ("ERISA"). *See* AR 3666 (plan document explaining that the "policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by" ERISA); Dkt. 15 at 5 ("This is an ERISA governed case regarding the denial of long term disability and waiver of premium for life insurance benefits.").

ERISA allows a plan participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *Metro. Life Ins. Co. v. Glenn*, 554 U.S.

---

[1] Waldron's complaint also mentions Life Insurance (LI) benefits. But Waldron makes no argument pertaining to the LI benefits, *see* Dkt. 15, and the same is true for Unum. Thus, the Court's order focuses only on the request for LTD benefits.

ORDER GRANTING PLAINTIFF'S RULE 52 MOTION FOR JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION - 2

105, 108 (2008) (ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court."). "District courts review a plan administrator's denial of benefits 'under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits.'" *Kieserman v. Unum Life Ins. Co. of Am.*, 574 F. Supp. 3d 896, 899–900 (W.D. Wash. 2021) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). The parties agree that the *de novo* standard of review applies. Dkt. 15 at 5; Dkt. 16 at 11 n.11.

Under de novo review, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Opeta v. Nw. Airlines Pension Plan for Cont. Emps.*, 484 F.3d 1211, 1217 (9th Cir. 2007) (quoting *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006)). Thus, with few exceptions, the Court's review is limited to the evidence the plan administrator possessed. *Kieserman*, 574 F. Supp. 3d at 900.

The Court's review "can best be understood as essentially a bench trial 'on the papers' with the District Court acting as the finder of fact." *Id.* (quoting *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003)). In assessing a Rule 52 motion for judgment, a court must ask "not whether there is a genuine issue of material fact, but instead whether [the claimant] is disabled within the terms of the policy." *Id.* (quoting *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999)). The court "can evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Id.* (quoting *Kearney*, 175 F.3d at 1094–95). Consequently, "the court may make factual findings, evaluate credibility, and weigh the evidence before it to determine whether the administrator correctly or incorrectly denied benefits." *Id.* (citing *Anderson v. Liberty Mut. Long Term Disability Plan*, 116 F. Supp. 3d 1228, 1231 (W.D. Wash. 2015)).

On *de novo* review, the plan administrator's determination is given no deference, but the plan participant bears the burden of proving his entitlement to benefits. *Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180, 1186 (9th Cir. 2022); *Baxter v. MBA Group Ins. Tr. Health and Welfare Plan*, 958 F. Supp. 2d 1223, 1227 (W.D. Wash. 2013). "Because the burden to prove entitlement to policy benefits rests on the claimant, the court must examine whether the participant has established, by a preponderance of the evidence, that the record supports the conclusion that he is entitled to benefits under the policy." *Louis v. Hartford Life & Accident Ins. Co.*, No. C19-56 MJP, 2020 WL 39145, at *7 (W.D. Wash. Jan. 3, 2020) (citing *Muniz v. Amec Constr. Mgmt., Inc.,* 623 F.3d 1290, 1294, 1296 (9th Cir. 2010)).

### III.    FINDINGS OF FACT

1.    Plaintiff Michael Waldron began working at James Hardie in July 2019. AR 314. He managed the daily operation of a production line in Hardie's manufacturing. AR 3014. In a typical shift, Waldron managed twenty to twenty-five people. AR 3015. He spent about eighty percent of the time moving around the plant reviewing production and employee performance. *Id.*

2.    James Hardie offered its employees disability insurance through Unum Life Insurance Company of America. AR 3665. The policy is governed by ERISA. AR 3666.

3.    The Unum plan offered both short- and long-term disability benefits. AR 717.

4.    Unum defined an individual as disabled when the individual was limited from "performing the material and substantial duties of [their] regular occupation due to [their] sickness or injury; and [they] have a 20% or more loss in [their] indexed monthly earnings due to the same sickness or injury." AR 3680. The plan explained that "[a]fter 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable

to perform the duties of any gainful occupation for which you are reasonably fitted by education, training, or experience." *Id.*

5.      Unum defined material and substantial duties as those that "are normally required for the performance of your regular occupation" and that "cannot be reasonably omitted or modified." AR 134.

6.      Unum defined regular occupation as "the occupation you are routinely performing when your disability begins." AR 135. Unum looks "at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." *Id.*

7.      Unum defined sickness as "an illness or disease." *Id.* Unum defined injury as "a bodily injury that is the direct result of an accident and not related to any other cause." AR 133.

8.      Unum's policy required that an individual be "under the regular care of a physician in order to be considered disabled." AR 3680. A physician includes: "a person performing tasks that are within the limits of his or her medical license; and a person who is licensed to practice medicine and prescribe and administer drugs or to perform surgery; or a person with a doctoral degree in Psychology (Ph.D. or Psy.D.) whose primary practice is treating patients; or a person who is a legally qualified medical practitioner according to the laws and regulations of the governing jurisdiction." AR 134.

9.      Unum's policy also required that an individual be "continuously disabled through [their] elimination period." AR 118. Unum would treat a disability as continuous if the disability "stops for 30 days or less during the elimination period." *Id.* The elimination period was the later of 180 days or the date the short-term disability payments ended. *Id.*; AR 132.

10.     On May 2, 2021, Waldron received the first dose of the COVID-19 vaccine. Waldron initially appeared to have common side effects of the vaccine. AR 3017.

11.     After these initial symptoms abated, Waldron continued to experience headaches, chronic fatigue, brain fog, dizziness, sleep issues, and double vision. *Id.*

12.     Following the onset of these symptoms, Waldron pursued medical care to determine the cause and find a treatment. *Id.*

13.     On May 8, 2021, Waldron visited his family practice provider, Paul Surette, MS, PA-C, at Tumwater Family Practice Clinic (TFPC). AR 412.

14.     On May 19, 2021, Waldron again visited Surette. The two discussed his symptoms. Waldron complained of mental fog, weakness, shortness of breath, fatigue, and intermittent low-grade fever. AR 3046. Surette referred Waldron to neurology and infectious disease as an initial step in determining his diagnosis. AR 3051.

15.     Waldron ultimately visited Surette, and his colleagues at TFPC, Jennifer Calser, PA-C, and Calvin Kuo, PA-C, fifteen times between May 2021 and January 2022. AR 1903–04. These providers referred him for blood tests, AR 413; MRIs, AR 407; EKGs, AR 408; and x-rays, AR 408.

16.     On May 27, 2021, Waldron had a neurology appointment with Dr. Greg Zoltani. AR 327–28. Waldron again complained of severe fatigue, headaches, generalized weakness, and eye pain. *Id.* Zoltani's impression was that these symptoms were caused by Waldron's COVID-19 vaccination. AR 327 ("Constellation of symptoms which I feel are secondary to the COVID vaccine.").

17.     Dr. Zoltani ordered an MRI of Waldron's head to further investigate the symptoms. *Id.* The MRI results were normal and did not help Dr. Zoltani determine the cause of Waldron's symptoms. AR 325.

18.     On June 9, 2021, Waldron had a follow-up appointment with Dr. Zoltani. AR 320. Waldron continued to experience "fogginess" and "pressure" in his head. He reported that it was

difficult to drive. *Id.* But, given the lack of diagnostic results, Dr. Zoltani could not offer any other treatment options. *Id.* Dr. Zoltani "reassured him that he should continue to improve over further time and he should resume his normal levels of activity." *Id.*

19. Waldron's symptoms persisted, including ongoing brain fog, fatigue, shortness of breath, dizziness, and headaches. Casler referred Waldron to a cardiologist. AR 3108–09. Waldron underwent a chest x-ray, but the findings were normal. AR 3216.

20. On July 1, 2021, Waldron saw an infectious disease specialist, Dr. Britta Denman. AR 447, 3094. The treatment notes recorded the same symptoms, along with a loss of concentration and coordination and double vision. AR 3094.

21. The same day, Waldron requested a remote consultation with the Mayo Clinic, which had been exploring treatments for symptoms of "long-COVID." AR 3405.

22. On July 2, 2021, Waldron had a real-time video consultation with a Mayo Clinic provider, Dr. Melanie Swift, M.D., M.P.H. Waldron again reported that he had a headache, severe fatigue, brain fog, dizziness, and blurred vision. AR 3083.

23. Dr. Swift concluded that Waldron's "constellation of symptoms overlaps significantly with post-acute COVID syndrome (PACS), however he has not experienced infection and has been tested multiple times. Since it may be an inappropriate immune response that underlies PACS, he may have experienced an inappropriate immune response to the mRNA vaccine which is mimicking PACS. His history of prior allergies requiring desensitization may be evidence of a tendency to have a highly reactive immune system." AR 284. But, because Waldron did not have a triggering COVID infection, Dr. Swift concluded he did not meet the long COVID diagnostic criteria. *Id.* Rather, "[i]n his case, the trigger may have been his COVID vaccination." *Id.*

24.     Dr. Swift advised Waldron to complete additional diagnostics locally, and, if no other source was determined for his symptoms, recommended "addressing his symptoms with a conservative approach that has provided benefit to our patients with PACS." AR 3087. The doctor advised "that the most important part of treatment is engage in regular activity that does not cause a prolonged flare. . . Pt instructed to start with very minimal activity, like walking around the home and minimal household chores, and slowly increasing activity as long as flares . . . do not occur." *Id.* The provider encouraged Waldron to resume his "normal daily schedule as possible," but, "[g]iven the physical demands of his job," advised him to "consult with his local treating provider to prescribe (and later modify) work restrictions when he is able to begin the process of returning to work. Starting with shorter hours, reductions in physical demand such as lifting/standing/walking restrictions, and restriction from safety-sensitive work would be advisable at first." AR 284–85.

25.     On July 13, 2021, Waldron saw a specialist in rehabilitation medicine, Dr. Christopher McMullen. AR 385. Again, Waldron reported the same symptoms. Waldron also reported feeling "down due to lack of available treatment" and "[f]rustrated with lack of available treatment." AR 3076. Dr. McMullen offered several treatment options, including nutrition, potential medications, and a formal physical therapy program. AR 3078.

26.     On July 28, 2021, Waldron began physical therapy at Providence Tumwater Valley Physical Therapy. AR 607. Though Waldron's symptoms fluctuated, he still experienced dizziness and headaches, often exacerbated by exercise, movement, or time on the computer. *Id.*

27.     On August 5, 2021, Waldron again visited Dr. Zoltani. AR 1346. Dr. Zoltani documented significant improvement in Waldron's symptoms but noted that Waldron was still very limited in his ability to perform physical activities. *Id.*

28.     On August 9, Waldron's physical therapist similarly noted some improvements. AR 602. Waldron had increased his walking ability to 15-minutes, twice per day. *Id.* Though "very fatiguing" he was "doing much better" with the minimal movement. *Id.* This kind of mild exercise still caused a headache and dizziness. *Id.* His reading ability had also improved, but he could "still only read about ½ page on screen or paper before vision goes blurry and can't focus on it any longer." *Id.*

29.     On August 17, Waldron tried to return to work. He lasted only four hours, and felt exhausted by the end of the day, with a notable increase in head pressure and dizziness. AR 598. He reported to his physical therapist that he subsequently "had a rough time" and had "essentially crashed." AR 595. The physical therapist noted that he appeared "very fatigued today." *Id.*

30.     The next week, Waldron's therapist set a new goal of walking for 20 minutes each day without extreme exhaustion or increased symptoms. AR 591.

31.     Waldron saw Dr. Swift at the Mayo Clinic again on September 30, 2021. AR 278. Swift noted that, since their last visit in July, Waldron had enrolled in care at the University of Washington's post-COVID rehab program. AR 279. Though initially helpful, Waldron found that returning to activity and work made his symptoms rebound. *Id.* The subsequent flare lasted several weeks. *Id.* Dr. Swift's assessment was ultimately the same. *Id.*

32.     Waldron's progress continued, albeit slowly. At an assessment on November 15, 2021, Waldron's physical therapist reported that he had a neck disability related to head pressure and fatigue. Waldron could not do recreation activities because of the pain, and continued to have moderate headaches, difficulty concentrating, and challenges sleeping. AR 3246. The physical therapist reported that he continued to have difficulty maintaining concentration and

responded well to "gradual exercise progressions" and "mild vision training activities." AR 3247.

33.     The physical therapist set several goals for Waldron. One was to perform forty-five minutes of exercise with short breaks without increased symptoms, or flare-ups, following the exercise. The therapist reported that the goal was "nearly met." AR 3248.

34.     But at another visit on November 22, Waldron reported a "significant return of his headaches last week, pain severe for about 4 days." AR 3250. Returning to a discontinued medication had helped some, but Waldron quickly fatigued with activity. There was no increase in headache symptoms. *Id.*

35.     On December 6, 2021, Unum notified Waldron that his short-term disability benefits would soon end and his claim would be considered instead for long-term disability (LTD) benefits. AR 59. Unum explained that, although Waldron had been approved for short term disability, he was not considered "automatically eligible" for LTD benefits. AR 60.

36.     Unum requested information to support Waldron's request for benefits. Unum sought information from both Waldron and his health care providers. Surette responded that Waldron had experienced severe fatigue and shortness of breath following his vaccination on May 2, 2021. AR 94. Surette explained that Waldron had "extensive workup" with various specialists for ongoing symptoms including headache, vision disturbance, and sleep disruption. *Id.*

37.     In response to a question asking whether Waldron would be "incapacitated for a single continuous period of time[,]" Surette entered begin and end dates of May 3, 2021 through May 2, 2022. *Id.* He indicated that the condition caused ongoing flare ups. *Id.*

ORDER GRANTING PLAINTIFF'S RULE 52 MOTION FOR JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION - 10

38.     In response to a question asking about Waldron's restrictions and limitations, Surette wrote, "shortness of breath and fatigue limit even minimal activities of daily living. Also has blurred vision that limits reading/computer work along with headache." AR 95.

39.     On December 7, 2021, Waldron visited TFPC and saw Surette, who affirmed that the same symptomology continued. AR 751. He explained "Patient is here today for follow-up on chronic fatigue and headache with dyspnea on exertion[.]" *Id.* "Patient complains of having some days that are better than others and []he cycles between 1 week of having improved energy level and the next week he may be fatigued and can't get out of bed." *Id.* Surette concluded, "[o]verall, patient seems to be improving with regards to his symptoms, however still significant disability from postviral or postvaccine syndrome." AR 752.

40.     On December 14, a representative from Unum called Waldron to discuss his application for LTD benefits. AR 227. Waldron detailed the above medical history and symptomology. Waldron also explained that he had tried to return to work several times. AR 228. But each time the "price [he] would pay afterwards" would leave him unable to move for anywhere from a day to a week. AR 228. Waldron told the Unum representative that his last attempt to return to work left him bedridden for an entire month. *Id.*

41.     Waldron believed the symptoms were related to the COVID-19 vaccine, but he was open to other possibilities (such as a COVID infection itself). He pursued testing for COVID-19 antibodies. AR 228–29. He received testing from a company called Innovative Bioanalysis Laboratory. AR 3209. The testing panel is not approved by the Food and Drug Administration for accuracy. *Id.* The test result, however, was positive. *Id.*

42.     On December 1, 2021, Waldron provided Unum with a disability certification from Surette. AR 95. The form explained that "[s]hortness of breath and fatigue limit even

1  minimal activities of daily living. Also has blurred vision that limits reading/computer work

2  along with headache." *Id.* Surette could not provide a return-to-work date for Waldron. *Id.*

3      43.    On January 6, 2022, Waldron had an appointment with the University of

4  Washington's neurology headache clinic. AR 504. He met with Dr. Natalia Murinova. AR 1150–

5  51. She documented continued uncontrolled headaches. *Id.* She noted that the headaches were

6  exacerbated by exertion, work, and eye strain. AR 1151; AR 504–10.

7      44.    Dr. Murinova diagnosed Waldron with new daily persistent headache (NDPH)

8  because he met "International Headache Society Criteria for NDPH in the context of COVID

9  vaccine." AR 1154. Waldron seemed intent on following the treatment plan. AR 1156.

10      45.    On January 13, 2022, Waldron again saw Surette. He reported the same

11  symptoms. AR 3037.

12      46.    On January 19, a representative from Unum called Waldron to discuss extending

13  the time for the company to complete their review of his file. AR 497. Waldron agreed. *Id.* The

14  representative confirmed the extension in writing. *Id.*

15      47.    Unum first had Joshi Vikrant, MBBS, review Waldron's claim file. AR 522.

16  Vikrant determined that the records failed to establish that Waldron was limited from performing

17  the duties of his regular occupation. Vikrant sought further review. AR 694.

18      48.    On February 8, 2022, Unum had internal medicine doctor Maribelle Kim review

19  Waldron's records. AR 696. Dr. Kim noted that Waldron had undergone an "extensive

20  diagnostic workup," but felt the "[r]ecords overall indicate that his reported symptoms are

21  inconsistent with and out of proportion to his extensive diagnostics, exam findings by multiple

22  providers, as well as the initial [con]sult." AR 697. Under the "whole person analysis" portion of

23  her report, Dr. Kim noted that, "although the records indicate that the insured was

24  evaluated/treated/prescribed meds for conditions including vitamin D deficiency and

depression/anxiety, the medical evidence does not support that these conditions would give rise to any additional restrictions and limitations. When all of the insured's multiple and comorbid conditions are analyzed, both individually and collectively as a whole, there are no additional restrictions and limitations from these co-morbid conditions that affect the functionality of the whole person." AR 698.

49.    Dr. Kim sent letters to Dr. Murinova and Surette, requesting they indicate agreement with the statement that "the medical evidence does not support that Ryan Waldron was/is precluded from 10/25/21 forward from performing sustained full-time (forty hours per week) activities which include: Exerting up to 20 lbs occasionally; frequent sitting; occasional walking, standing, reaching, handling, fingering, keyboard use, Mental/cognitive demands include: directing, controlling or planning activities for others; influencing people in their options, attitudes and judgments; performing a variety of duties; attaining precise set limits, tolerances and standards; dealing with people; making judgments and decisions." AR 689.

50.    Dr. Murinova did not respond. Dkt. 16 at 7.

51.    Surette did respond, indicating by checking a box marked "Yes" that he agreed that the medical evidence did not support that Plaintiff was precluded from working as of October 25, 2021. AR 689.

52.    Dr. Kim determined that, as of October 25, 2021, Waldron could fulfill his "light demand level occupational duties full-time." *Id.* On October 25, 2021, Waldron had received an echocardiogram which had been "normal." AR 688.

53.    Dr. Kim noted, however, that the review was "recommended because the issue is not one of adequate information but rather of interpretation of the data in terms of functional capacity." AR 698. As a result, she asked that another reviewer consider the file. *Id.*

54.     Unum next appointed internal medicine doctor Zachary Gross to review Waldron's file. AR 704–05. Dr. Gross agreed with Dr. Kim's assessment that Waldron was not disabled after October 25, 2021. AR 704.

55.     Dr. Gross found that "[t]here are no specific physical findings in the medical reports to support that the claimant would be unable to perform occupational demands as outlined. Treatment intensity has been of mild intensity consisting of medications, follow-up with headache clinic, physical therapy, possible sleep study, and periodic follow-up appointments with PCP. This is inconsistent with restrictions and limitations. Diagnostic work-up has been essentially unremarkable as well." *Id.*

56.     Dr. Gross pointed out that Waldron's occupational medicine provider, Dr. Swift "noted that the claimant may have experienced an inappropriate immune reaction to the COVID vaccine which is mimicking post-acute COVID syndrome, and she encouraged the resumption of a normal daily schedule as possible. This is inconsistent with restrictions and limitations." AR 705.

57.     Dr. Gross also noted that "[t]here have been no referrals or neuropsychological evaluations. This is inconsistent with restrictions and limitations." *Id.*

58.     Dr. Gross disregarded the COVID-19 lab results, explaining that although "the innovative bioanalysis labs revealed an elevated long hauler index score these labs are not based on traditional or evidence-based approaches to evaluation and treatment. It is noted that these results may be helpful for research purposes and getting a better understanding of the pathophysiology of immunological, infectious, or inflammatory disorders. Furthermore, the term long hauler has been applied to patients who have had a history of positive COVID-19 infection which he has not had. This is inconsistent with restrictions and limitations." *Id.*

59.    Thus, Dr. Gross concluded, "There are no clinical findings present in the available records to support the degree of the insured's self-reported impairment precluding the performance of the outlined occupational demands." *Id.*

60.    Thus, on February 28, Unum denied Waldron's claim for LTD benefits. AR 717–23.

61.    Unum's denial explained that the policy provided by Waldron's employer, James Hardies, requires that an insured be continuously disabled through an "elimination period" to be eligible to receive LTD benefits. In Waldron's case, the elimination period began May 2, 2021 and ended November 9, 2021. AR 717.

62.    Unum determined that Waldron's records did not support the restrictions and limitations of his functional capacity, "as stated by Dr. Murinova and Paul Surette" beyond October 25, 2021. AR 718. They found that his records suggested that he did not meet the definition of disability after that date.

63.    Unum pointed to the medical evidence indicating that no formal diagnosis had been determined, and that many test results were "normal." *See* AR 718–19. Unum also noted that Waldron did not indicate a referral for a neuropsychological evaluation, "which would be expected if you were thought to have an impairing cognitive condition." AR 719. Unum thus concluded that Waldron's "treatment plan of medication, continued follow-up with the headache clinic, physical therapy, possible sleep study and periodic follow-up appointments with your primary care can typically be provided concurrently while performing your noted light demand level occupational duties, full-time." *Id.*

64.    On August 22, 2022, Waldron appealed Unum's determination. He explained that "[h]e was open to seeing any doctor or performing any test that Unum recommended to

substantiate his disability claim" and asked Unum to "let me know" what those were, as "I want my life back." AR 846.

65.     In his appeal, Waldron included quantitative EEG study findings indicating "some slowing in the brain, but also some fast wave activity in other areas which could be contributing to memory problems and reported problems with cognition." AR 981.

66.     Waldron also reported that he was seeking treatment from Dr. Daniel Hanson, a neurologist, a second different neurologist in Utah, Neuro-Wave Brain Performance Center, an infectious disease doctor, and a neuropsychiatrist. AR 834. Waldron detailed various experimental therapies he had tried as well. *Id.*

67.     Waldron attached a letter from Dr. David Palacios—a naturopathic physician he had begun seeing on April 5, 2022—who explained that the patient had been disabled as of May 2, 2022, and would be disabled for an "undetermined" amount of time. AR 941. The assessment was sent to Unum on August 10, 2022. *Id.*

68.     Shortly after, Waldron withdrew his appeal, AR 1018, and hired counsel to help him initiate a new appeal, AR 1024.

69.     On February 27, 2023, Waldron submitted his second appeal. AR 2983–3031. The appeal detailed several additional medical visits that Waldron had undertaken following the denial.

70.     On January 10, 2023, Waldron visited with Dr. Steven Plaza, a naturopathic doctor, who confirmed Waldron's symptomology. AR 3030.

71.     On January 19, 2023, Waldron saw Scott Marsland, a Nurse Practitioner at the Advanced COVID Care Center. Marsland wrote: "The very idea that [Waldron] would be able to work an eight hour shift which demanded standing and physical exertion, let alone mental focus and multi-tasking, in his current state is neither realistic nor likely in the near future." AR 3033.

72. On January 20, 2023, Waldron underwent a neuropsychology evaluation with Dr. Meghan Callahan. The objective testing showed there was "no evidence of severe psychiatric illness, conversion disorder, or malingering." AR 3026. The evaluation documented issues with processing speed and verbal fluency. AR 3026–27.

73. The neuropsychologist explained, "Mr. Waldron reported difficulty with short term memory, concentration, word finding, processing speed, and complex thinking. He finds many cognitive skills to be 10 times more difficult than before . . . . He forgets his medications 2–3 times a week. . . . he forgets his intentions and loses items often. . . . He has word finding problems, though this has improved. His simple attention is intact, but concentration is taxing and more difficult. He does better with minimal distractions. He additionally has trouble with reading, writing, and performing mental calculations. He denied reading comprehension concerns, but he sees double when reading sentences and fatigues quickly. He attended school for mechanical engineering and now must stop and think about multiplication tables." AR 3020.

74. The neuropsychologist also noted that Waldron's labs, completed in May 2021, "revealed Epstein Barr Virus (EBV), low vitamin D, elevated liver enzyme (ALT), and other abnormal results." AR 3021.

75. Ultimately, Unum upheld its initial decision. Dr. Steven Winkel reviewed and opined that there was no diagnosis to explain Waldron's symptoms. AR 3567. Unum sent Winkel's findings to Waldron's counsel. Counsel responded, contesting Winkel's findings, AR 3577–91, but Unum upheld its denial on May 12, 2023. AR 3595–3609.

## IV.    FINDINGS OF LAW

1

2

**A.    Statements of Waldron's providers—including those detailing his self-described symptoms—are reliable evidence of disability.**

The Ninth Circuit has repeatedly found that certain conditions are "largely []self-reported illness[es] that cannot be diagnosed through any objective medical test." *Perryman v. Provident Life & Accident Ins. Co.*, 690 F. Supp. 2d 917, 945 (D. Ariz. 2010) (first citing *Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998)); and then citing *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1112 (9th Cir. 1999)); *see also Veronica L. v. Metro. Life Ins. Co.*, 647 F. Supp. 3d 1028, 1040–44 (D. Or. 2022) ("Plaintiff claims that in denying her benefits, Defendant wrongly discredited her self-reported symptoms. In cases involving conditions like CFS [chronic fatigue syndrome], for which no objective tests exist, the plan administrator must consider self-reported symptoms in determining disability."); *Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan, Plan No. 625*, 856 F.3d 686, 696 (9th Cir. 2017) ("But as we have previously acknowledged, [CFS is] not established through objective tests or evidence."); *Ayers v. Life Ins. Co. of N. Am.*, 869 F. Supp. 2d 1248, 1253–54 (D. Or. 2012). This is especially true for certain difficult to diagnose conditions, such as chronic fatigue syndrome (CFS), *see, e.g.*, *Tam v. First Unum Life Ins. Co.*, 491 F. Supp. 3d 698, 710–12 (C.D. Cal. 2020); headaches, *Hegarty v. AT&T Umbrella Benefit Plan No. 1*, 109 F. Supp. 3d 1250, 1256–57 (N.D. Cal. 2015); fibromyalgia, *Eisner v. The Prudential Ins. Co. of Am.*, 10 F. Supp. 3d 1104, 1114–15 (N.D. Cal. 2014); and long-COVID, *Abrams v. Unum Life Ins. Co. of Am.*, 647 F. Supp. 3d 1061, 1065 (W.D. Wash. 2022).

Further, many courts have held that it is unreasonable to reject a claimant's self-reported evidence when the plan administrator has no basis for believing the reports are unreliable and where the plan does not limit proof to "objective" evidence. *See, e.g.*, *Shaw v. Life Ins. Co. of N. America*, 144 F. Supp. 3d 1114, 1128 (C.D. Cal. 2015) (collecting cases); *Bigham v. Liberty Life*

*Assurance Co. of Boston*, 148 F. Supp. 3d 1159 (W.D. Wash. 2015) (rejecting defendant's contention that because the plaintiff's symptoms were purely subjective it is "appropriate for an administrator to require objective evidence of functional restrictions"); *Stratton v. Life Ins. Co. of N. America*, 589 F.3d 1145, 1174 (S.D. Cal. 2022) (similar).

For example, in *Abrams v. Unum*, Unum denied LTD benefits for a long-COVID patient. 647 F. Supp. 3d at 1063–64. The patient was an attorney who could not work after he had COVID. *Id.* In its denial, Unum explained that "Mr. Abrams has reported disability primarily based on fatigue and other somatic complaints, including weakness, brain fog, and a persistent fever," but that "mental status and physical exam findings" were "generally unremarkable." *Id.* at 1064. Unum stated that neuropsychological tests "demonstrated essentially normal cognitive functioning with the exception of some isolated findings with visual-spatial skills," which was "consistent with his documented mental status exams which did not document cognitive deficits." *Id.* Unum added that according to its consultant, "Mr. Abrams did not meet the criteria for CFS" because "his medical records have not supported significant cognitive impairment," as is "required for the diagnosis of CFS." *Id.*

The *Abrams* court disagreed, finding instead that the plaintiff was unable to perform the duties of his occupation throughout the elimination period, and that he was unable to perform his duties through the date of the court's decision. *Id.* at 1066–67. Three doctors diagnosed Plaintiff with long-COVID and four diagnosed him with CFS—all based on his subjective reporting of symptoms. *Id.* at 1066. Neuropsychological testing revealed that Plaintiff was not malingering. *Id.* The Court thus concluded that the plaintiff was disabled by a "sickness" defined in the plan policy as an "illness or disease." *Id.*

Similarly, in *Bunger v. Unum Life Insurance Company of America*, the court determined that Unum had conflated the question of whether the plaintiff had been sick with the issue of

whether the plaintiff had been accurately diagnosed with CFS. 196 F. Supp. 3d 1175, 1187 (W.D. Wash. 2016). The Court explained, "Unum may be correct that Mr. Bunger has not been correctly diagnosed. But that does not mean he is not sick. If Mr. Bunger's complaints, and Dr. Taggart's assessments, are to be believed, Mr. Bunger cannot focus for more than a few minutes at a time, making it impossible for Mr. Bunger to perform the . . . tasks his job requires." *Id.*

Both *Bunger* and *Abrams* rely on the Ninth Circuit's decision in *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011), a case assessing the provision of LTD benefits for a patient with CFS. There, the Ninth Circuit held that a disability plan had wrongly denied a claimant benefits because the plan (1) relied on internal file reviews rather than the records from the doctors who personally examined the claimant and (2) demanded "objective tests to establish the existence of a condition for which there are no objective tests." *Id.* But, as the court explained, "[t]here is no blood test or other objective laboratory test for chronic fatigue syndrome." *Id.* at 677. Instead, "[t]he standard diagnosis technique for [CFS] includes testing, comparing symptoms to a detailed Centers for Disease Control list of symptoms, excluding other possible disorders, and reviewing thoroughly the patient's medical history." *Id.*

This is not to diminish the challenges that ERISA plan administrators face in assessing employees who are disabled by a mysterious array of symptoms. *Nagy v. Grp. Long Term Disability Plan for Emps. of Oracle Am., Inc.*, 183 F. Supp. 3d 1015, 1028 (N.D. Cal. 2016), *aff'd*, 739 F. App'x 366 (9th Cir. 2018). Many of these symptoms, like "un-refreshing sleep and muscle/joint paint, are difficult if not impossible for plan administrators to verify." *Id.*; *see also Anderson*, 116 F. Supp. 3d at 1238 ("Vertigo, fatigue, and nausea are subjective experiences that cannot be easily measured by an objective standard, but that does not mean such symptoms should be discounted or disbelieved."). But "the absence of objective test results and observable

symptoms present equally frustrating challenges for employees who actually suffer from debilitating [similar] symptoms." *Nagy*, 183 F. Supp. 3d at 1028. As the court in *Salomaa* recognized, "the claimants are not the only ones with an incentive to cheat. The plan with a conflict of interests also has a financial incentive to cheat. Failing to pay out money owed based on a false statement of reasons for denying is cheating, every bit as much as making a false claim." 642 F.3d at 678.

"This complicated dynamic" is present here. *Nagy*, 183 F. Supp. 3d at 1028. While doctors have run a multitude of tests on Waldron, these tests have done little more than "rule out other diseases" and have failed to establish the presence or absence of any one condition. *Eisner*, 10 F. Supp. 3d at 1114 (quoting *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872 (9th Cir. 2004) *overruled on other grounds by Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 969 (9th Cir. 2006)). As explained above in the Court's findings of fact, every provider that Waldron visited affirmed his symptoms. Though none could provide a clear diagnosis, many indicated that it seemed like an inappropriate immune response to the vaccine, which mirrored long-COVID, CFS, or Lyme Disease, and rendered him unable to work. *See, e.g.*, AR 94, 283, 284–85, 320, 327–28, 377, 392, 385–86, 388, 398–99, 401, 404, 407, 412, 941–42, 1149–50, 1154, 1057, 1160, 1164, 3273–3276, 3027, 3517. Many of these providers explained that until the symptoms resolved, Waldron could not return to work full time. *See, e.g.*, AR 94 (Surette stating that Waldron would be disabled from at least May 3, 2021 through May 2, 2022); AR 3033 ("The very idea that [Waldron] would be able to work an eight hour shift which demanded standing and physical exertion, let alone mental focus and multi-tasking, in his current state is neither realistic nor likely in the near future."); AR 602 ("Reading is better—but can now still only read about ½ page on screen or paper before vision goes blurry and can't focus

on it any longer."). None concluded that the symptoms were fake, or that Waldron was

malingering. *See, e.g.*, AR 3026.

In fact, Waldron underwent a neuropsychiatric evaluation which found there was "no

evidence of severe psychiatric illness, conversion disorder, or malingering." *Id.* The test did,

however, show issues with processing speed and verbal fluency. AR 3026–27. The evaluation

report explained:

> Mr. Waldron reported difficulty with short term memory, concentration, word
> finding, processing speed, and complex thinking. He finds many cognitive skills to
> be 10 times more difficult than before . . . . He forgets his medications 2–3 times a
> week. . . . he forgets his intentions and loses items often. . . . He has word finding
> problems, though this has improved. His simple attention is intact, but
> concentration is taxing and more difficult. He does better with minimal distractions.
> He additionally has trouble with reading, writing, and performing mental
> calculations. He denied reading comprehension concerns, but he sees double when
> reading sentences and fatigues quickly. He attended school for mechanical
> engineering and now must stop and think about multiplication tables.

AR 3020. Waldron could drive for no more than ten minutes at a time. AR 3021. He also often

felt head pressure in his forehead over his eyes. AR 3020. Notably, the evaluator also pointed out

that Waldron's lab results, conducted in May 2021, "revealed Epstein Barr Virus (EBV), low

vitamin D, elevated liver enzyme (ALT), and other abnormal results." AR 3021. Though many

of these symptoms are "subjective," they are still confirmed by the evaluation.

The only opinion to the "contrary" is Surette's indication that he believed the medical

evidence did not support Waldron's disability from October 25, 2021 onward. AR 689. The

parties dispute what exactly Surette meant when he filled out the form. Dkt 16 at 13; Dkt. 18 at

7–8. Still, the Court finds that the opinion—even if viewed as a claim that the evidence did not

support that Waldron was disabled after this date—stands alone. All of Surette's other records

indicate that Waldron was and would be disabled for an indeterminate amount of time, at least

through May 2022. *See, e.g.*, AR 94 (indicating expected to return to work date in May 2022);

AR 95 (indicating no expected return to work date "pending current workup with multiple specialists").

Thus, the Court concludes that it may consider subjective evidence in determining whether Waldron has met his burden to show that he could not work both during the elimination period and after under the policy. *See, e.g.*, *Perryman*, 690 F. Supp. 2d at 945–46. Though "the medical evidence is sparse in the sense that the notes of [Waldron's] treating physicians generally do not explain how the results of their clinical testing support their conclusions that [Waldron] is unable to work, the subjective judgments of [Waldron's] treating physicians formed from their overall experiences . . . must be considered in evaluating their opinions of the extent and effect of her impairments." *Id.* at 946 (first citing *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988); and then citing *Lester v. Chater*, 81 F.3d 821, 832–33 (9th Cir. 1995)). Waldron's treating physicians' "subjective judgments are especially important in this case given the subjective nature of [his condition], the fact that its symptoms are sporadical inasmuch as they fluctuate in frequency and severity, and the fact that it can exist even though physical examinations may be within normal limits." *Id.*

**B.     Unum's policy did not require that Waldron provide only objective evidence to show that he was disabled.**

The Supreme Court has "recognized the particular importance of enforcing plan terms as written" in ERISA claims. *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 100 (2013). When reviewing an ERISA plan, a district court must "apply contract principles derived from state law . . . guided by the policies expressed in ERISA and other federal labor laws." *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007) (internal citation omitted). "Those direct us to look to the agreement's language in context and construe each provision in a manner consistent with the whole such that none is rendered nugatory." *Dupree v. Holman Pro.*

*Counseling Ctrs.*, 572 F.3d 1094, 1097 (9th Cir. 2009). "[T]erms in an ERISA plan should be interpreted in an ordinary and popular sense as would a person of average intelligence and experience." *Gilliam*, 488 F.3d at 1194. "In interpreting the terms of an ERISA plan, we examine the plan documents as a whole and, if unambiguous, we construe them as a matter of law." *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 626 (9th Cir. 2008) (quoting *Welch v. Unum Life Ins. Co. of Am.*, 382 F.3d 1078, 1082 (10th Cir. 2004)).

Accordingly, where a plan denies coverage because of a lack of objective evidence—and the plan terms do not limit the type of evidence required—courts reject the plan's reasoning. *See, e.g.*, *Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192, 1199 (9th Cir. 2010) (holding that insurer abused its discretion based on "an unwritten and unexplained objective evidence requirement" not in its policy); *Shaw*, 144 F. Supp. 3d at 1128 (collecting cases); *Stratton*, 589 F.3d at 1174 (similar). Some insurers now include such terms in their plans. *See, e.g.*, *Morgan v. Hartford Life & Accident Ins. Co.*, 274 F. Supp. 3d 1176, 1178 (W.D. Wash. 2017). Others, however, do not.

Unum did not include an objective evidence requirement in the text of Waldron's plan. *See generally* AR 3671–3713. The plan terms require that "proof" of an insured's claim include the date disability began; the existence and cause of the sickness or injury; "that your sickness or injury causes you to have limitations on your functioning and restrictions on your activities preventing you from performing the material and substantial duties of your regular occupation or of any other gainful occupation for which you are reasonably fitted by education, training, or experience"; that you are under the regular care of a physician; the name and address of any institution or physician who provided treatment; and documentation of earnings. AR 3671. Nowhere in the portion of the plan detailing what information is needed for proof of a claim does

Unum state that objective evidence is required. AR 3671–72. Such language is not included anywhere in the plan documents provided. *See generally* AR 3671–3713.

Thus, the Court will consider the subjective evidence Waldron offered. *See Waldrip v. Reliance Standard Life Ins. Co.*, No. 321CV05602JHC, 2023 WL 3090837, at *10 (W.D. Wash. Apr. 26, 2023) (collecting cases); *Tam*, 491 F. Supp. 3d at 710–11 (rejecting plan's demand that claimant provide objective medical evidence of debilitating fatigue and pain).

**C.    The Court may also consider medical assessments conducted after the elimination period.**

Unum dismisses any assessments conducted after the elimination period as irrelevant and argues that the Court should do the same. *See, e.g.*, Dkt. 16 at 13, 14–15. But several courts in this circuit have held differently. For example, in *Witney v. United of Omaha Life Ins. Co.*, No. 2:20-cv01273-RAJ, 2022 WL 4483179, at *11–12 (W.D. Wash. September 27, 2022), an insurer similarly questioned doctors' statements in support of the plaintiff's LTD claim because they were untimely. The court disagreed, explaining that "those statements should not be discounted simply because they were submitted after the Elimination Period, when plaintiff submitted her LTD claim." *Id.*; *see also Smith v. Brown*, 849 F.2d 1222, 1225 (9th Cir. 1988) ("It is obvious that medical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis."); *Tam*, 491 F. Supp. 3d at 711 n.11; *Lyttle v. United of Omaha Life Ins. Co.*, 341 F. Supp. 3d 1071 (N.D. Cal. 2018).

Similarly, in *Abrams*, after Unum (the insurer there as well), denied the insured's claim, the insured appealed. 647 F. Supp. 3d at 1064. In supporting his appeal, the insured saw several doctors. *Id.* "Working with the same symptoms of brain fog, fatigue, decreased attention and concentration, and fevers, three of the medical doctors diagnosed Plaintiff with long COVID, . . . and four of the medical doctors diagnosed him with Chronic Fatigue Syndrome (CFS)." *Id.*

1    (cleaned up). Each of these providers concurred that the claimant was sick, and the Court

2    considered the providers' assessments in its review of the record. *Id.*

3        Here too, the Court will consider the opinions of providers who assessed Waldron after

4    the elimination period ended. There is no legal or factual reason to ignore them.

5    **D.    The Court may disregard reasoning for the claim denial offered by Unum in its motion but not during the determination process.**

6        The structure of ERISA dictates what a court may consider upon review. By statute,

7    "every employee benefit plan" shall "provide adequate notice in writing to any participant or

8    beneficiary whose claim for benefits under the plan has been denied, setting forth the specific

9    reasons for such denial, written in a manner calculated to be understood by the participant."

10   *Collier*, 53 F.4th at 1185 (quoting 29 U.S.C. § 1133(1)). The notice of claim denial must contain:

11   (1) "[t]he specific reason or reasons for the denial"; (2) "[r]eference to the specific plan

12   provisions on which the determination is based"; (3) "[a] description of any additional material

13   or information necessary for the claimant to perfect the claim and an explanation of why such

14   material or information is necessary"; and (4) "[a] description of the plan's review procedures

15   and the time limits applicable to such procedures, including a statement of the claimant's right to

16   bring a civil action under section 502(a) of the Act following an adverse benefit determination on

17   review." *Id.* (quoting 29 C.F.R. § 2560.503–1(g)(1)(i)–(iv)). Further, when a plan denies a claim,

18   the plan must provide "an explanation of the basis for disagreeing with or not following" the

19   conclusions of the claimant's treating "health care professional," the "vocational professional[ ]

20   who evaluated the claimant," or "medical or vocational experts whose advice was obtained on

21   behalf of the plan in connection with a claimant's adverse benefit determination." *Id.* (quoting 29

22   C.F.R. § 2560.503–1(g)(1)(vii)(A)(i)–(ii)).

23

24

If a claim is denied, the claimant must be allowed an opportunity for a "full and fair review" of the denial. *Id.* (quoting 29 U.S.C. § 1133(2); 29 C.F.R. § 2560.503–1(h)(4)). If a plan relies on a new rationale during review, the plan must tell the claimant and "give [him] a reasonable opportunity to respond." 29 C.F.R. § 2560.503–1(h)(4)(ii). Were a court to rely on "new rationale to affirm the denial of benefits," the insured would not have a chance to respond to the new rationale and would be denied his right to a "full and fair review" of the claim denial. *See Collier*, 53 F.4th at 1182.

Unum argues that, because the Court is conducting a *de novo* review, the Court should "not assess whether Unum's decision was reasonable or correct." Dkt. 19 at 9. But, even on *de novo* review, the "district court's task is to determine whether the plan administrator's decision is supported by the record, not to engage in a new determination of whether the claimant is disabled." *Collier*, 53 F.4th at 1182. "Accordingly, the district court must examine only the rationales the plan administrator relied on in denying benefits and cannot adopt new rationales that the claimant had no opportunity to respond to during the administrative process." *Id.*

Thus, any errors Unum made in its decision, and the extent to which any such reasoning was communicated to Waldron, is relevant to the Court's analysis. The Court will consider only those reasons offered by Unum for the denial, and will, as needed, determine whether Unum's decision is supported by the record.

In its letter to Waldron denying his claim, Unum concluded that he did not meet the definition of disability after October 25, 2021. AR 4130. But here Unum argues that Waldron has not met his burden of proving that he could not work on a part-time basis. Dkt. 16 at 15. Yet, nowhere in the determinations process did Unum offer such reasoning to Waldron. Still, Unum tries to argue that it would have been "nonsensical for Unum to reference the part-time provision in the administrative process, because it only applies if a claimant is approved for LTD benefits

in the first instance, i.e., 'during the first 24 months of payment.'" Dkt. 19 at 10. Unum claims that it is only pertinent now because Waldron "has put the issue before the Court even though it was irrelevant during the administrative process." *Id.*

But that is not what Unum puts forth in its briefing. Rather, Unum explains, "[i]f Plaintiff had been eligible for LTD benefits, payments would have begun in November 2021, but would have ended immediately in the event Plaintiff was able to work on a part-time basis but did not." Dkt. 16 at 15. Unum continues, "there is simply no evidence in the Administrative Record that Plaintiff was unable to earn at least 20% of his prior earnings as of November 2021 and going forward. Rather, it appears that none of the providers who worked with Plaintiff during this period considered whether Plaintiff was able to work part-time, let alone rendered any opinions to that effect." *Id.* Thus, Unum concludes, Waldron "has not met his burden of proving that he would qualify for ongoing LTD benefits after November 2021 even if had met his initial burden of proving that he was unable to perform the material duties of his regular occupation during the elimination period, which he has not." *Id.* In arguing that Waldron failed to argue both that he was disabled during the elimination period and that he could not work part-time after November 2021, Unum sets forth a new justification for denying benefits after October 25, 2021. The Court is barred from considering Unum's new reasoning.

**E.      Waldron was disabled under the plan.**

Having determined what evidence the Court may consider, the Court now turns to assess whether Waldron has met his burden to show by a preponderance that he was disabled under the plan terms with respect to his "regular occupation" during and after the elimination period.

The parties agree that Waldron was covered under the LTD plan. AR 3665–66. At issue is whether Waldron was disabled under the plan terms. *See generally* Dkt. 15; Dkt. 16. The plan does not require that Waldron be completely incapacitated or that he have a permanent disability.

AR 118. Rather, Waldron can prove that he is disabled under the plan terms if he can show that he cannot perform the material and substantial duties of his regular occupation because of sickness or injury. *Id.* And he must have been continuously disabled throughout the elimination period, the later of 180 days or the date that short term disability ends. *Id.* The parties do not dispute that the elimination period is May 2021 through November 9, 2021. AR 717; Dkt. 16 at 2. Unum, however, argues that Waldron was no longer disabled as of October 25, 2021. AR 698; Dkt. 16 at 8.

Unum points to October 25, 2021, when an echocardiogram found that Waldron's heart was healthy. AR 697–98. As explained above, the existence of certain conditions cannot be ascertained by a simple test. *See Eisner*, 10 F. Supp. 3d at 1114. And while objective tests—like an echocardiogram—can rule out other diseases, they fail to establish the presence or absence of a different chronic condition. *Id.* Thus, the normal echocardiogram result does not show that Waldron was not disabled on October 25, 2021. *See, e.g.*, *Salomaa*, 642 F.3d at 678 ("[A] disability insurer [cannot] condition coverage on proof by objective indicators such as blood tests where the condition is recognized yet no such proof is possible."). The test bears "only on potential causes of [Waldron's] symptoms, but do[es] not disprove the existence of the reported symptoms themselves." *Entz v. Standard Ins. Co.*, No. EDCV19402JGBSHKX, 2020 WL 5496072 (C.D. Cal. Sept. 11, 2020).

Unum also points to encouragements from medical providers that Waldron will eventually be able to "resume his normal levels of activity" and may engage in such activities so long as they do not "cause a prolonged flare of fatigue." Dkt. 16 at 12 (quoting AR 320; AR 284). These quotes often cherry-pick statements made by the providers. For example, the provider indicating that Waldron could eventually resume his normal activities also validated Waldron's reported symptoms and believed that these symptoms were caused by Waldron's

COVID-19 vaccination. AR 327 ("Constellation of symptoms which I feel are secondary to the COVID vaccine."). And the providers who encouraged him to return to activity cautioned him to sustain such activity only if it did not cause a flare in his symptoms. *See, e.g.*, AR 284, 3027. As documented in the findings of fact, such activities did cause flares, and Waldron was often bed-bound for weeks as a result. Thus, on the advice of his medical providers, Waldron could not return to such activities.

Nor could Waldron return to work. Waldron argues that Unum's denial of benefits was unreasonable because Unum failed to consider that his regular occupation required him to be "at the plant" for 60–70 hours per week and walk for 80% of the day. Dkt. 18 at 9. Waldron relies on his own description of his work. But the plan terms regular occupation as "the occupation you are routinely performing when your disability begins" and explains that "Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." AR 3605.

Unum had a vocational consultant review Waldron's job description and concluded that a similar job in the national economy would require frequent sitting; occasional walking, standing, reaching, handing, fingering, keyboard use; and occasional exertion up to 20 pounds. AR 3596. Mental and cognitive demands included directing, controlling, or planning activities of others; influencing people in their opinions, attitudes, and judgments; performing a variety of duties; attaining precise set limits, tolerances, and standards; dealing with people; and making judgments and decisions. *Id.* Unum's denial letter cited this language. *Id.* In his appeal, Waldron explained that his demands were far greater than those considered. AR 3596–98.

On appeal, Unum contracted with an independent vocational reviewer to address these concerns. AR 3598. In the appeal denial, Unum explained that Waldron's description may be apt for "the job he performed for the employer within his specific location" and thus the information

did "not alter [Unum's] vocational review[.]" *Id.* Unum adjusted the job requirements only

minimally, adding that Unum was required to lift up to 10 pounds "frequently" and "negligible

amounts constantly." AR 3599. Unum added walking and standing into the occasional activity

list, noting that "[s]tanding and walking may combine to 2/3 of the workday on some days

depending on production needs." *Id.* And Unum added greater detail to each of the cognitive

demands:

> **Cognitive demands (temperaments) include:**
>
> - **Directing, Controlling, or Planning Activities for Others:**
>   Involves accepting responsibility for formulating plans, designs, practices,
>   policies, methods, regulations, and procedures for operations or projects;
>   negotiating with individuals or groups for agreements or contracts; and
>   supervising subordinate workers to implement plans and control activities.
> - **Influencing People in their Opinions, Attitudes, & Judgments:**
>   Involves writing, demonstrating, or speaking to persuade and motivate
>   people to change their attitudes or opinions, participate in a particular
>   activity, or purchase a specific commodity or service.
> - **Performing a Variety of Duties:**
>   Involves frequent changes of tasks involving different aptitudes,
>   technologies, techniques, procedures, working conditions, physical demands,
>   or degrees of attentiveness without loss of efficiency or composure. The
>   involvement of the worker in two or more fields may be a clue that this
>   temperament is required.
> - **Attaining Precise Set Limits, Tolerances, and Standards:**
>   Involves adhering to and achieving exact levels of performance, using
>   precision measuring instruments, tools, and machines to attain precise
>   dimensions; preparing exact verbal and numerical records; and complying
>   with precise instruments and specifications for material, methods,
>   procedures, and techniques to attain specified standards.
> - **Dealing with People:**
>   Involves interpersonal relationships in job situations beyond receiving work
>   instructions.
> - **Making Judgments and Decisions:**
>   Involves solving problems, making evaluations, or reaching conclusions
>   based on subjective or objective criteria, such as the five senses, knowledge,
>   past experiences, or quantifiable or factual data.

AR 3599.

Unum's job description may control, but the Court finds that Waldron has offered sufficient evidence to show that he could not perform even these lighter occupational demands. Doctors who personally examined Waldron, including Surette, Swift, Callahan, Plaza, and Palacios, concluded that his condition made it impossible to for him to reliably perform his essential job functions. AR 94–95, 718, 284, 320, 3027. Though none explicitly said he was "unable to work," *see* Dkt. 19 at 6, their documentation of his symptoms and their advice show that Waldron could not return to work. *See, e.g.*, AR 94–95,718. Each doctor describes debilitating symptoms and difficulty maintaining basic functioning. This evidence alone is persuasive that Waldron is disabled under the Plan. *See Salomaa*, 642 F.3d at 676–79.

Waldron has provided ample evidence that he could not perform even minimal job tasks. *See, e.g.*, AR 94–95, 1154, 3033 ("The very idea that [Waldron] would be able to work an eight hour shift which demanded standing and physical exertion, let alone mental focus and multi-tasking, in his current state is neither realistic nor likely in the near future."); AR 602 ("Reading is better—but can now still only read about ½ page on screen or paper before vision goes blurry and can't focus on it any longer."). Waldron tried to return to work several times. He never made it through an entire shift and remained bedridden for weeks—even an entire month. AR 228, 598. As of November 15, 2021, Waldron could not do recreation activities, suffered moderate headaches, could not concentrate, and barely slept. AR 3246. His physical therapist set a new goal of performing forty-five minutes of movement per day, with short breaks and without any subsequent flare-ups. AR 3248. The goal was "nearly met." *Id.*

If Waldron could not move for more than forty-five minutes per day without suffering a flare-up, *see id.*, suffered daily headaches, *see* AR 279, 3250, and could not use a computer, *see* AR 95, then Waldron could not be expected to perform his job even part-time during the elimination period. *See Abrams*, 647 F. Supp. 3d at 1067 (similar); *see also Volynskaya v.*

*Epicentric, Inc. Health & Welfare Plan*, 2007 WL 3036110, at *10 (N.D. Cal. Oct. 16, 2007) (explaining that even if the plaintiff could perform sedentary work with her fibromyalgia and CFS, such a finding was not equivalent to a finding that she could perform her own occupation and earn more than 80% of her pre-disability earnings.).

The ebbs and flows in Waldron's condition do not suggest otherwise. Courts have repeatedly held that patients who suffer chronic conditions may improve, but given the temporary nature of those good days, these swings do not materially alter their ability to work. *See, e.g.*, *Peterson v. Fed. Express Corp. Long Term Disability Plan*, No. CV-05-1622-PHX-NVW, 2007 WL 1624644, at *34 (D. Ariz. June 4, 2007) ("a total-disability determination cannot reasonably hinge on whether an employee is minimally capable, on a good day, at the right hour, of fulfilling her job duties in barely tolerable fashion. Qualification for employment requires an ability to work effectively and to be reliable."); *Thivierge v. Hartford Life & Acc. Ins. Co.*, No. C 05-0163 CW, 2006 WL 823751, at *13 (N.D. Cal. Mar. 28, 2006) ("As Plaintiff notes, there has been no significant change in her condition. She still has good days, when she can function, and bad days, when she cannot function. It is unpredictable whether Plaintiff will have a good day or a bad day, and, as [her doctor] notes, the bad days can continue for up to two weeks. A full-time employer cannot handle such inconsistent attendance and unpredictability."). Waldron was never able to sustain a return to work, as it caused significant flares that left him bedridden for weeks. AR 279; 595–98.

Unum contends that Waldron's symptoms are purely subjective. *See supra*, Sec. IV.A. But as explained above, Unum provides no legal justification for denying benefits based on the lack of objective symptoms. Unum concedes that the Court should consider Plaintiff's reported systems, which were extensively considered and discussed in Unum's letter of May 12, 2023. Dkt. 19 at 10 (citing AR 3603). But, Unum explains, "subjective evidence is persuasive only to

the extent it is corroborated by other evidence of medically documented impairments showing that she has functional limitations or restrictions that render her disabled from working." *Id.* (quoting *Louis v. the Hartford Life and Accident Ins. Co.*, Case No. 2:19-cv-00056-MJP, 2020 WL 39145, at *8 (W.D. Wash. Jan 3, 2020)). Unum argues that "Plaintiff's subjective evidence is outweighed by the medical evidence, including the opinion of his PCP [Surette]." *Id.* at 11.

The Court disagrees. "Vertigo, fatigue, and nausea are subjective experiences that cannot be easily measured by an objective standard, but that does not mean such symptoms should be discounted or disbelieved." *Anderson*, 116 F. Supp. 3d at 1237–38 (citing cases). As stated in the findings of fact above, it is clear that Waldron has suffered a range of symptoms that inhibited him from doing his job both during and after the elimination period. Unum "provides no credible reason to disbelieve the reports" of Waldron or his medical providers "regarding [his] symptoms and their disabling consequences." *Id.* at 1238. To the extent that any test, such as a neuropsychological evaluation, relies on the patient's description of their condition, this is not a reason to "invalidate or undermine" the test. *Tam*, 491 F. Supp. 3d at 711. Whether Unum's contention that Waldron needed to provide objective evidence was implicit or explicit, *see* Dkt. 19 at 10, it ignored the realities of his condition.

And none of Waldron's providers have ever even hinted that they thought Waldron was fabricating his symptoms. Rather, his doctors continued to treat his reported symptoms by recommending and implementing new treatment options, ordering endless tests, and providing various referrals to help establish the cause of Waldron's symptoms. *See, e.g.*, AR 407, 408, 413, 1903–04. Waldron underwent a neuropsychiatric evaluation which found there was "no evidence of severe psychiatric illness, conversion disorder, or malingering." AR 3026.

The only medical providers who questioned the veracity or severity of Waldron's symptoms are Unum's reviewers. Unum's reviewers never saw Waldron in person. "There is no

'treating physician rule' in ERISA cases." *Kieserman*, 574 F. Supp. at 900–01 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). That is, the Court need not give special deference to treating physicians over those who conducted reviews. *Hamid v. Metro. Life Ins. Co.*, 517 F. Supp. 3d 903, 916–17 (N.D. Cal. 2021). "But this does not preclude a district court, engaging in *de novo* review, from evaluating and giving appropriate weight to a treating physician's conclusions, where reliable and probative." *Kieserman*, 574 F. Supp. at 901 (citing *Reetz v. Hartford Life and Accident Ins. Co.*, 294 F. Supp. 3d 1068, 1083 (W.D. Wash. 2018)).

Here, especially given the subjective nature of Waldron's condition, the Court chooses to give weight to the opinions of Waldron's treating providers. Waldron visited Surette and others at TFPC fifteen times over the course of the administrative record. AR 1903-04. Dr. Swift at the Mayo Clinic, someone who specialized in treating long-COVID, concluded that Waldron's "constellation of symptoms overlaps significantly with post-acute COVID syndrome." AR 284. A multitude of providers saw Waldron, observed his symptoms, and recounted them without question. They saw in real time the symptoms he described. And none contested it.

Given the plan's definitions of "Disabled," "Sickness," and "Material and Substantial Duties," and based solely on the administrative record,[2] the Court finds that Waldron was disabled within the meaning of the plan.

## V.    CONCLUSION

The Court hereby FINDS and ORDERS:

1) Defendant's Motion for Judgment (Dkt. 16) is DENIED.

---

[2] Plaintiff argues that the Court should incorporate by reference arguments made by Waldron's attorney on his appeal. Dkt. 15 at 19–20. Defendant disagrees. Dkt. 16 at 17. The Court need not address these arguments because the Court did not consider Waldron's appeals counsel's reasoning in its decision.

2) Plaintiff's Motion for Judgment under Federal Rule of Civil Procedure 52 (Dkt. 15) is GRANTED. Waldron has established his disability under Unum's plan terms based on his regular occupation and is entitled to recover LTD benefits.

3) The parties shall meet and confer regarding the amount of benefits owed and any prejudgment interest, and jointly submit a proposed judgment within ten (10) days of the date of this Order.

4) Plaintiff's request for attorney's fees under 29 U.S.C. § 1132(g) must be filed no later than 14 days after the entry of judgment as required by Federal Rule of Civil Procedure 54(b)(2). The motion shall be supported by documentary evidence reflecting the amount of fees and costs sought and shall include argument as to the authority upon which fees and costs may be granted and why the fees sought are reasonable. The motion shall be noted as a 21-day motion under this Court's local civil rules.

Dated this 28th day of March, 2025.

Tiffany M. Cartwright
United States District Judge